Oral argument not to exceed 15 minutes per side. Mr. Nalbaladeen for the defendant appellate. I'll probably chop that up there, but I apologize for that. Good morning. May it please the court. I'm John Nalbandeen on behalf of Case Western Reserve University. And I'd like to reserve three minutes for rebuttal. Your Honors, the trial court here committed one major error. It failed to accord to Case Western the appropriate high level of deference that Case Western should receive for its substantive academic decisions. That determination by the court was in turn based solely on its view that a substantive academic decision could not be based on professionalism considerations. Even in the context of a medical school. As a result, the trial court ordered Case Western to confer a degree on plaintiff without citing a single case from this court or any other court, for that matter, to support its decision. Because the trial court's decision was incorrect, this court should reverse the grant of a permanent injunction, apply the appropriate level of deference, and grant judgment to Case Western. One thing that bothers me about this case is the fact that your client didn't seek a stay. It bothers me in two respects. One, it makes me wonder if it mooted the case. And I get the idea that Case Western has reserved the right to withdraw the degree if they win in the litigation. But I'm still not 100% sure that solves the mootness problem entirely. But in combination with that, what seems almost mean is now the question is whether we effectively pull someone out of a residency or internship, whatever he's doing right now. Because Case Western let that go forward. I mean, without a degree, he couldn't start the internship. Am I right about that? Absolutely, yes. So Case is saying, I mean, and you see this in the record, Case is, you know, they still are recommending him. You only have that one addendum, but they're still recommending him pretty favorably for all these things. So they're just, they're always on both sides of the line here. And I feel like they're doing, they did the same thing at the stay level. If they really believed this, they should have said, no, if you don't deserve a degree, of course you should not be starting an internship until this problem is solved. Or we come up with some solution to it. So it's, I don't know, it just puts us in a really tough spot that we're being asked to pull someone out of an internship, which perhaps is a little harsher than what is deserved here. I mean, it seems to me this ought to be the kind of, because I'm willing to agree with you, there's some serious problems here with this fellow. But is the only answer, you know, end of story on this career? You know, I don't know. It seems really an extreme option. There's a lot there, Your Honor, and I'm not sure where to start. But with respect to this case. Why not seek a stay? Well, we don't understand it. I mean, we asked for accelerated treatment of the case, and we were prepared, and of course injunction cases are treated in this court on an accelerated basis. But the question is starting the internship or not. And you allowed him to start the internship. That was Case saying, go ahead, you can't be that bad. I'm sure if they thought he was really, really bad, they would never have let him do that. So there's already some ambivalence going on. Your Honor, I mean, obviously there are strategic considerations in litigation with regard to whether you. Because of the risk of losing this day? Well, for the risk and damages, perhaps, Your Honor. I mean, Case Western obviously genuinely believed that he should not have a degree, and that's why we're litigating the appeal. In terms of mootness, we felt that obviously this is not an injunction case where it cannot be undone. So I don't think there's a mootness issue here. I mean, we can talk about that if you want. But, I mean, this can be undone. This court has said and the Ohio Supreme Court has said that degrees can be revoked by universities. So, I mean, that possibility is there. Am I right to assume that if the degree is revoked, the internship ends immediately? Yeah, I mean, he would not have the qualification to be on the internship, right? What were the consequences to the university of doing whatever it took to not permit that internship or residency to go forward? Could you have prevented it? I mean, you could have said, hey, we're not going to recommend you for this residency. We're not going to do whatever the university has to do to permit that to go forward. What were the risks there? In terms of when? You mean when we did the original, when we did the recommendation letter that has the addendum? Yeah. I'm not sure I understand. You already voiced that there were risks about damages. You seem to. I'm sorry. With regard to the stay calculation, with regard to whether what was going to happen in litigation at that point going forward. In other words, if we had said, you know, we want to stay, are we exposing ourselves to additional liability? That's not related to the letter. I mean, the letter, I mean, this goes back to the recommendation letter and the addendum. I'm not sure that there was a risk on the part of the university. I think the university made the judgment that, you know, this student has shown enough that we'll issue the recommendation letter, but at the same time we're going to attach an addendum, which, you know, Dean Haney testified he had never done before in terms of professionalism. So, I mean, this is a major thing for them to put this addendum on this recommendation letter. Are there risks of damages if you seek a stay and you get it? I mean, that would have been the Sixth Circuit saying this should be stayed. I mean, why is the university then exposing itself? I mean, if it's denied, no risk. If it's granted, it's the Sixth Circuit's responsibility. I think if it's granted, Your Honor, and then, you know, the internship is put off and then eventually the plaintiff prevails, I think they could come back and say, you know, we were, I mean, it's like any stay where you would, or an injunction, where you have to put an injunction bond. You have as much risk of damages with everything that happened in this case. Dying the degree, you know. I disagree, Your Honor. I think it's the same thing. Why do we have injunction bonds? I mean, you secure the other side when you get an injunction against damages that they might incur. I mean, the consideration here is that this case could be resolved within a fairly, you know, short amount of time, and that was certainly what we asked for. And, I mean, we're here in, you know, obviously in January, and that was this summer, and I specifically asked to go on in October, and, you know, that couldn't be done. But, you know, that was the calculation that we made. I don't think it booted the case, and I'm not sure that it undermines any of our legal arguments. I mean, I understand you're saying, okay, well, you know, this is a harsh result, or this could be a harsh result. But, I mean, there are cases out there where degrees have been revoked. I mean, we have situations where, you know, lawyers, doctors have licenses. I'll tell you the way it enters my thinking on the mootness is I'm not 100% sure what case will do if you win. Given its ambivalence in the past and given, in their defense, fair ways of thinking about this problem, it's not 100% obvious to me that a victory for case does anything more than give them leverage in another way of resolving this case. In other words, it's not obvious to me that what happens if you win is cases, degree revoked, you're out of the internship, we don't want to hear from you again. It's possible that's what they'll do, but it's not obvious to me that's what they'll do based on their track record with this dispute. So that's how it's entering my thinking, that we're basically being asked to give an advisory opinion, to give leverage to the university, because the university, remember, did try to resolve this in another way, and then plaintiff, for better or worse, chose to sue. I admire the university for not thinking this is an all-or-nothing-at-all proposition. That's the way I would think about it. But anyway, that's how it's entering my thinking on mootness. I guess I don't see that, Your Honor. I don't see how it would be an advisory opinion. I mean, we have a permanent injunction. We have been ordered to do something. We were ordered to deliver a degree. The court looked at it, applied what we're saying is the wrong legal standard, and we're asking this court to reverse that opinion and reverse that grant of an injunction. I think that's concrete. That would all be well and good if I were 100% sure you were going to act on the victory. Your Honor, you can never be 100% sure of what's going to happen when you send a case back. I mean, are you saying, oh, we would go back and we would settle the case or we would do, you know, our litigation strategy might change? I mean, litigation strategy does change. I mean, we know that. I mean, if you were to reverse or let's say you vacated and sent it back with directions to apply, I mean, that's what you would be talking about, I guess. I mean, we've asked that you enter judgment, but I understand if you're not going to do that. If you vacate, send it back, we go back to the trial court, and the direction is you must apply, this is an academic decision, you must apply the high level of deference, right? So at that point, we're in an adversarial position again, and you're saying, well, I don't trust that you would, what, that we would continue to fight to revoke the degree, that we might settle the case? You didn't seem to care that he got it. I mean, I'm here today. I mean, we've been litigating this appeal. I mean, I don't know. The other thing about mootness is it has a fairness quality to both sides. What do you do? You muntzing where it says you vacate the district court's decision. That will make you happy. It puts everybody back at square one, figure out if there's a sane way to deal with this. I'm not sure that's a, I'm not sure how that affects the mootness consideration. No, I'm saying mootness has a fairness component to it because muntzing where it says the district court judgment, which you do not care for, gets vacated. Everyone is back to square one. And if you look at what happened before he sued, the university was trying to deal with this in a different way. Yes, absolutely. That suggests that's where they want to be. Mootness with vacater puts you exactly in that place. You can think again whether suing is the best way to deal with this. The trial court's opinion being on the books is problematic. That's what muntzing where it means. It's vacated. Yes, well, muntzing where it deals, I thought, with whether you can settle a case and get it vacated. I'm thinking of Bonner Mall, perhaps. No, no, no, no. The norm when you moot something because of developments during the appeals, you vacate the district court opinion because the losing side didn't get a chance to challenge it. So in a way, that's a victory because that case is gone. The opinion below. Well, anyway, go on with your regular arguments. Well, I must say you didn't leave him much time. I know, I know. Well, it's because I agree with his other arguments. I'm not sure what else I have to say, Your Honor, other than just to emphasize that this is a substantive review situation. This is not a procedural due process case, so obviously the standard of review is extremely high. I mean, there are no questions about procedure here. It's a private university. We're talking about whether we had a rational basis, effectively, to make this decision. I think it's hard for us to say that we didn't at least have a rational basis. But I'll save my time with that. Come on, Your Honors. Peter Holdsworth. It's my honor to represent Dr. Amir al-Dabah. The district court properly granted the injunctive relief sought in this matter, and as Judge Sutton has pointed out, this was an extreme and unique situation, an extreme and unique set of facts, both today, as the case currently exists with Dr. al-Dabah in the residency at Riverside, and also back in the spring of 2014 when the case was making its decisions in this matter. And applying those unique set of facts to this case, the district court held lengthy hearing on the matter, issued a well-reasoned 25-page opinion considering all of the factors that have been raised, and came to the conclusion that Case Western had Did you really say professionalism is not part of getting a medical degree any more than professionalism is not part of getting a license in law and keeping a license in law? Of course it's part of it. And I don't disagree that the concept of genuine professionalism can, under the proper circumstances, fall under the rubric of academic decision-making. Then don't we give deference to the university on those questions? Not to the definition of what constitutes professionalism in this instance, where Case Western, this is where it becomes extreme. Case Western overstepped its bounds by creating a definition of professionalism that would effectively include any decision, as to any decision or anything that a student could potentially do. And we know from Horovitz and from Ewing, that the deference only applies when there is a genuinely academic decision at hand. And we have, in this case, evidence that the court considered and demonstrably shows that this was not a genuinely academic decision. Because, most importantly, we do have that April 10, 2014 letter from Case saying that despite any other issues that may have happened in the past, you are going to graduate with distinction for honors in research. You are going to receive your graduation award certificate. So, at that point, the question of whether or not Dr. Eldebaugh had done what was required to graduate had already been decided. There are straws that break the camel's back all the time, and he made the mistake of timing on these last straws. And, you know, Judge, taking that analogy one step further, I would submit that this isn't a straw that broke the camel's back. The camel's in the barn, the pack's been removed, and there's no straw that's breaking his back, because we have the statement during the May 27 hearing that the crux of Case's decision was that Dr. Eldebaugh supposedly didn't disclose an arrest for the misdemeanor in 2013. But this is a question of, really, contract interpretation. We have a specific contract term in the handbook that says, here's your duty to report as to criminal matters, criminal background check, and that would include convictions, misdemeanor and felony convictions. We have a specific term on that point. Now, Case is attempting to use a general concept, and these are admittedly, per Dean Pedrino, at the May 27 hearing, these are generic concepts of professionalism. That is the quintessential definition of a general contract term at issue here. So we have a specific contract term. But what happens if you lose? What happens to your client? What are the options out there? Do you think you can't have an internship without a degree? Correct. Before your client filed this lawsuit, it looked to me like the university was trying to figure out a way to resolve this, to get them at a higher comfort level and figure out some way to let your client proceed with the profession. Is it too late for that? It is indeed too late for that. So there's been efforts at mediation on this? There was conference with the mediator. Our mediator or trial level? Correct. No, here. Okay, and that didn't work? And that didn't work. I don't know that there were really genuine efforts by case to try and give Dr. Eldabaugh any other option but going forward without his medical school diploma. And under those circumstances, Dr. Eldabaugh couldn't have begun the residency. Do you re-enroll? I mean, does someone re-enroll, someone who's failed to meet the requirements, re-enroll and cure the deficiency? I should think that's an option. An option that would have provided no relief for Dr. Eldabaugh in these unique circumstances because, number one, he's completed chronologically five years of medical school, four years of actual didactic learning in the process. He's at the very end of that rope, and at the very last minute he's had the degree revoked. We get the equities on your side, but answer Judge Cook's question. Why if you just forget professionalism for a second, why if you just fail a class and you don't get the degree on time, can't you re-enroll to pass the class? It's the match program. That's the key. It's the residency. That's the key. Dr. Eldabaugh is... He'd be back into the match later. Respectfully, Your Honor. He can't do it. Respectfully, no. He could attempt to apply for a match, but his chances of receiving a match... Of course are diminished. Not only diminished. Gone. Completely gone. Okay. You say that because it's such a difficult process anyway, that if you have a stain on your record, is that why you say it's gone? Correct. Dermatology is... But he had a stain. I mean, they knew about the addendum. Even more so, Judge. They knew about the addendum, but then Dr. Eldabaugh didn't get one residency. He obtained two. The revocation of a degree, and once you're in that match program, if you're removed from that match program, which is what happened here. He had been accepted at Riverside. He had agreed to go there, and also had agreed to go to... So here's the part that's not adding up. I'm trying to... I think Judge Cook's question is the one I'm trying to get answered, and I'm just not understanding the practical part of this. I understand how residencies work. I understand about matches. What doesn't make sense to me is he's allowed to enroll, and they're still employing him in a setting where they have to know the university that gave him this degree does not think he deserves it. The only way he gets the degree is by using the Constitution or state law to get the degree, but the university does not want to give it to him. If you fix this problem, whether through six months, a year, you now have a setting where the university wants him to have the degree, presumably will say, to his credit, he has fixed this problem. We now support him wholeheartedly. Addendum gone. It just doesn't make sense that setting one seems like the more remarkable one that he's staying employed. Judge, I'm going to paraphrase. I don't have the exact affidavit verbiage in front of me, but I believe in one of Dr. Eldabaugh's affidavits that was submitted, the undisputed point was made that this really is the end of the road because his prospects in the match program... It's the prospects. It is. Well, it's so completely obliterated that he has no chance, and really, if he leaves... There is a deferral? There is not. Well, there is a deferral under the program, but before you are matched with the residency. Okay, so he has been matched or he hasn't been matched? He is. He's in the residency program at Riverside. Right, right. So what I'm not getting is I would have thought the norm out there was it happens not all the time, but it happens that you match, and then for whatever reason, you're asked to serve in Iraq for a year. You defer the start of the residency for a year or delay from finishing internship to starting residency for a year, and all that happens in that year for him is he removes this blot, which it should be in everyone's interest to remove. Case is the residency program and his. In an ideal world, I would agree with Your Honor. The problem is in the practical, unique facts of this case, Dr. Eldabaugh getting into a prestigious dermatology residency is effectively nil if case is permitted to do what it was going to do and not give him a diploma. I thought you said he was already in the program. Now he is because he has his diploma. So just say it now gets deferred while he corrects his problem. That's all I'm saying. You ask for a deferral for a year. I just don't understand how you can be 100% sure the residency program wouldn't prefer someone who solved this problem as opposed to one who has gotten over it because of a federal court. These are incredibly prestigious, very competitive programs that all students are seeking to match in. Dr. Eldabaugh did match before case sought to withdraw his diploma. And we have from Dr. Eldabaugh's affidavit that if we go down this rabbit hole, at the end of it, he's not going to get this. It's not an option to defer this. It doesn't mean he doesn't ever practice. It doesn't mean that. He could. What you're saying is he would no longer qualify for the elite match that he's obtained. Unlikely any other. Correct. But he could be a dermatologist. No, he couldn't. Not without going through that residency. Oh, right. He would not specialize. That residency. Correct. Right. The one he liked. Correct. And that's the unique set of facts, the unique damages that were at issue here. And Dr. Eldabaugh was not your garden variety, run-of-the-mill student in medical school. He was publishing in respected journals of dermatology, developing huge networks in the field of dermatology. It's an incredibly competitive field in medicine. And he had laid that foundation before the case sought to do what it was going to do here. I wonder, counsel, if you'd go back to your argument. There's a point you made that I'd circle back to if I could. You say you support the district court's judgment on the grounds that the case's only support doing purely academic criteria. Genuinely academic. Genuinely academic. You had a better word. Like Judge Sutton, I'm saying how does, in a profession, law no different than medicine, how do we draw a wall between academic and professional? In a profession. Judge, since Horvitz and Ewing in 1977 and 1985, there have been multiple cases discussing whether or not an issue was academic or not. There's no bright-line standard, and I think what we can take out of that is that... I'm just suggesting the term academic necessarily has to include the component of ethics slash, in this case, the other features. I'm not disagreeing with Your Honor. In the sense that genuine professional, profession of medicine issues that relate to... We're still just parsing the genuineness, right? You say it has to be academic, but you say what was treated as professionalism wasn't genuine enough. Well, what we know from this case, Your Honor, is that the case revealed during the May 27 hearing that the issue of professionalism was an alleged failure to disclose a misdemeanor arrest. That's it. Because by that point, Case had already made the decision that Dr. Eldebaugh had the right stuff, had met the criteria to graduate. In April 10, they congratulate him. They send him a personalized letter. We've seen that. We've seen the words. The words, I thought, could be read to say you're academically qualified. It didn't promise the degree. It said your degree will be issued with distinction because of your research. Sure. It's a graduation award certificate. I would respectfully submit to the Court that that demonstrates a level of conscious thought. Completion of requirements. Correct. Correct. Is it your position that none of the other things that Case Western pointed to as being of serious concern to them relative to professionalism, none of those actually factored in? Is that your view? Your Honor, it's my position that those were not, as Judge Wynn noted, these were not the big deal that Case is making them out to be now because of the unique facts and the concessions on the record in that April 10 letter of congratulations and perhaps most importantly, the performance evaluation that was issued after everything else. This is in January of 2014, granted with the addendum. Case sends out the MSPE to all the residency programs, in this case 20 to 30 programs, saying that Dr. Eldabaugh met all of the professionalism standards, and that's my words, not theirs. But the quotes from them is Dr. Eldabaugh is a professional with patients and team members. He conducts himself professionally. He was professional in his interactions. These are the statements regarding Dr. Eldabaugh's professionalism after. I read this whole record as they didn't want to have to do this, and your client ultimately gave him no choice, and that's what it conveys. It conveys the complete opposite of any malice of singling him out. They wanted him to improve. They wanted to overlook these things, but at some point they said, oh, my gosh, this guy is going to embarrass us, and he's going to cause some real problems in the profession, and we need to stop it now. That's the way I look at it. I hear you, Your Honor, and I understand. But they didn't want to do it. But here's where I don't know the motivation, frankly. I know that question has been bagged as to why would case do what it does. I don't know. We didn't file this as a 1983 claim. We didn't file it as a due process claim. It's strictly a straight-up breach of contract claim, so motivation isn't a factor in this case. But, Your Honor, we know that case, despite all those other issues, said that it was a failure to disclose an arrest for a minor misdemeanor that happened on his own personal time 500 miles away. At some point it said it targeted that, but I think it's unfair to characterize and maybe unfair of Judge Gwynne to characterize that that was the end-all, be-all. We have counsel's own concession on the record where Judge Gwynne said, if an out-of-state DUI can constitute professionalism, what wouldn't? And counsel's response was, the answer is as long as they act in bad faith, as long as they act in what? Excuse me. I'm in the wrong spot, Your Honors. The point was that case indicated, and here's the answer. The question was, he was in line to graduate. Counsel indicated, yes, I think that's correct, but the reason he is, quote, in line to graduate is because he did not disclose his conduct. That's the record at 21, page 689 to 690. He did not disclose his conduct. That's the real reason. That's why they did what they did. But it doesn't say that's the only reason. I'm just saying we know the record is replete with references to other conduct, four or five things that seem to add up. But that's a grant you that they definitely focused on that one, maybe backed into the other. If your concern is only that it was conduct that you don't view as being particularly serious, what if case Western's view was he had an obligation to disclose? He didn't. The problem with that, Judge, is it's a question of not professionalism or academics. It's a question of contract interpretation. We have a handbook that says a specific contract term saying you have a duty to report misdemeanor or felony conviction. It doesn't say anything to an arrest, and now Case is attempting to metamorphosize that into a general contract duty to report arrests as well. So this isn't a question of Case's academic discretion. I think Case just got the law wrong and thought they could because he didn't report the arrest, though Ohio contract law says you can't, and I think that's what Judge Gwinn properly recognized. And I see I am well out of time, Your Honors. May I briefly conclude? Please. Thank you, Your Honors. The district court did properly evaluate these facts, did apply the proper standard in Ewing and Horovitz that would be applied to academic institutions, and under the unique facts of this case, the district court properly granted the injunctive relief sought. And for these reasons, we request that the June 2nd order be affirmed in its entirety. Thank you. Thank you, Counsel. Mr. Nalbandian, what's your response to this point about arrests versus conviction and construing the state law? I mean, construing the contract that he just ended with. Well, I think in terms of what, Your Honor? I mean, He's making the point that the university is using a misreading of the contract as a basis for saying, so that's There are a couple of points there, Your Honor. Obviously, the DWI incident has a lot of components to it. The failure to report the arrest, the failure to report the conviction. That's the one he's focused on. He's saying there was no failure to report because the contract didn't require it. Right. Technically, yes, there's that term. But in this particular situation, and we have the testimony of the doctors, this student was under scrutiny for professionalism issues, part of which concerned alcohol, obviously, and was talking, remediating professionalism, dealing with the doctors every day on this issue, gets this DUI and doesn't think it's necessary to report that that's going on. But his contract didn't require it. Well, but in this circumstance with this student, the doctors felt like he was concealing something. I mean, we're talking to you every day about professionalism and alcohol and whatever, and then this happens over here, and you don't even bother to come and tell us, hey, you know, this happened. I mean, in their view, that was a lack of professionalism. The testimony we were just read essentially suggests case hinged its entire decision. The answer suggested that it was the failure to report what the so-called contract didn't require. Nothing else. It wasn't, no, this is one factor. No, that wasn't the testimony. It was, it's that. It's that failure to tell us that he was arrested. I disagree, Your Honor, I suppose, about what the state of the record is on that. I mean, the affidavits are... Just talking about the response to that. Yeah, I think, I mean, I don't know what was said at the hearing. There was no sworn testimony at the hearing, so I don't know. I mean, obviously, Dr. Petrino... I suppose we were reading from the hearing. Your Honor, that was from the hearing. That was a statement of counsel, not a statement of... I knew that, yeah. Okay, but I'm just saying, if you look at the witness statements, they say clearly this is a totality of circumstances. We're looking at everything that happened throughout the... Plus the multiple witnesses testified to each of the features. Yes, that all nine members of the committee, when they looked at this, this was... Counsel focused on that, I see. We've had everybody else talk about it. Right. And, again, let me get, it's not just the failure to report the arrest. I mean, there is an obligation to report the conviction, and the plaintiff reported it to Riverside, not to Case Western, okay? I mean, there was also the fact that it's a drunk driving conviction. I mean, that's serious in and of itself. I mean, he was drinking and driving. It's a problem. You used the term conviction in the statement that the argument has been made, that there was nothing but an arrest. No, he was convicted. I mean, he was found guilty in North Carolina. And he didn't report that. He did not tell Case Western. He told... He didn't tell Case Western. Your view is that, under the requirements set out in the handbook, i.e., the conviction. He had to do that, yes. He had an obligation to do that. Yes. But I'm just, I guess my broader point is there's more to the drunk driving than just the failure to report the arrest. I see my time is up. I'm happy to answer any other questions. My only point, Your Honor, by the way, and it's been a while since I've looked at Munsingware, but my only concern is that we would have a Bonner Mall issue if, in your view, it was our failure to seek a stay that would cause that issue. That's my worry. But anyway, thank you. Thank you, counsel. The case will be submitted.